AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

ROBERT RUSSELL DAWSON II, RESIDING AT 7957 DRY FORK RD, NORTH TAZEWELL, VIRGINIA

)
)
)
)
)
)

Case No. 1:21 mj 141

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHED

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHED

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1951 | Interference with Commerce by Threats or Violence (Hobbs Act) |
| 18 USC 924(c)(1)(A) | Using a Firearm During and in Relation to a Crime of Violence |

The application is based on these facts:
SEE ATTACHED.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Peter Gonzalves, ATF Special Agent
*Printed name and title*

Sworn to before me ~~and signed in my presence~~ telephonically.

Date: 11/29/21

City and state: Abingdon, VA

*Judge's signature*

Honorable Pamela Meade Sargent, USMJ
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ROBERT RUSSELL DAWSON II** | Case No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Peter Gonzalves, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant and order for the taking of known saliva samples, by means of buccal swabs, from Robert Russell DAWSON II, for the purpose of conducting DNA comparison analysis, as evidence of him having violated Title 18, United States Code, Section 1951, interference with commerce by threats or violence, and Title 18, United States Code, Section 924(c)(1)(A), using a firearm during and in relation to a crime of violence.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since August 2016. I am currently assigned to the Bristol, Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Special Agent with the U.S. Department of State, Diplomatic Security Service for approximately six years. I have taken part in numerous federal, state,

1

and local investigations concerning document and identity fraud, financial fraud, cybercrimes, firearms and narcotics, and violent crimes violations.

3. During my tenure in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug conspiracies, and methods and techniques commonly employed during the commission of violent crimes, including robbery. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance; controlled buys; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen-register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance. Further, I have participated in the preparation, presentation and execution of numerous search and arrest warrants which have resulted in the recovery of weapons, narcotics, money, and documentary evidence indicative of firearm and narcotic trafficking organizations. Additionally, I have assisted in investigations and arrests leading to convictions for violations of federal and state firearms and narcotics laws to include violent crime.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951, interference with commerce by threats or violence (Hobbs Act robbery), and 18 U.S.C. § 924(c)(1)(A), using a firearm during and in relation to a crime of violence, have been committed by DAWSON. There is also probable cause to indicate DNA samples collected from DAWSON will serve as evidence to inculpate DAWSON in the violation under investigation.

## PROBABLE CAUSE

6. On May 9, 2021, at approximately 8:15 PM, an individual entered Bare's Discount Tobacco and Wine ("Bare's") located at 970 E. Main St. in Abingdon, Virginia, which is located in Washington County in the Western Judicial District of Virginia. According to the store clerk (hereafter known as "Victim 1") who was on duty at Bare's at the time, the individual produced a handgun and demanded access to the cash register and money safes. Victim 1 described the suspect as a tall and muscular white male, wearing a knit hat, a bandana covering his face, blue jeans, and a green jacket. Victim 1 also reported the suspect placed a black handgun on the counter as he demanded cash. At approximately 8:23 PM, the

suspect exited the store after taking approximately $35 in cash and two cartons of cigarettes without paying. Other than Victim 1 and the suspect, no additional individuals can be seen on security footage in the store during the time the suspect was inside the business.

7. Bare's sells alcohol, tobacco, and packaged food products, many of which were manufactured and/or procured from sources outside the state of Virginia and therefore moved in interstate commerce.

8. Investigators with the Abingdon, Virginia Police Department ("APD") later reviewed surveillance footage provided by Bare's and other businesses in the surrounding area. Surveillance footage shows that, at approximately 7:30 PM on May 9th (surveillance footage timestamp), a white Dodge Journey with an unknown license plate ("the suspect vehicle") drove around the exterior of Bare's and the adjacent businesses. Based on my training and experience, the suspect vehicle appears to be "casing," or surveilling the area in anticipation of committing a crime. At approximately 7:40 PM, the suspect vehicle appears to pull into a parking space at the Burger King located at 915 E. Main St. in Abingdon, Virginia. At approximately 8:05 PM, the suspect vehicle exited the Burger King parking lot.

9. From approximately 8:07 PM through 8:12 PM, the suspect vehicle drove through parking lots of businesses between the BP station located at 906 E.

4

Main St. in Abingdon, Virginia and Bare's. At approximately 8:14 PM[1], the suspect vehicle can be seen pulling into the BP gas station parking lot. An employee at the BP reported seeing a white Dodge Journey in the parking lot occupied by two individuals, and that one of the individuals exited the vehicle behind the BP station and tossed a brown paper bag at the dumpster. APD investigators recovered and packaged a Burger King bag with a receipt attached from the BP dumpster. The bag contained partially eaten food including french fries, as well as napkins, empty ketchup packets and wrappers. The aforementioned items have been sent to the Virginia Department of Forensic Science laboratory in Roanoke, Virginia for DNA testing, and the results are pending

10. At approximately 8:14 PM[2], an individual wearing similar clothing and matching the physical description of the suspect can be seen on surveillance footage walking from the rear of the BP parking lot in the direction of Bare's. At approximately 8:15 PM, the suspect entered Bare's and encountered Victim 1. At approximately 8:23 PM, the suspect exited the store and can be seen on surveillance footage walking from the area of Bare's toward the BP station.

---

[1] This time was erroneously listed in previous affidavits as 8:20 PM. This affidavit has been updated to reflect the correct time.

[2] This time was erroneously listed in previous affidavits as 8:20 PM. This affidavit has been updated to reflect the correct time.

11. On or about May 11, 2021, a Washington County Sheriff's Office ("WCSO") investigator reported having a phone conversation with Michael MILLER after the robbery occurred. During this conversation, MILLER informed the investigator he was driving a white Dodge Journey belonging to "B.H." during the weekend. B.H. is an associate of MILLER's, though there is no evidence to date of B.H. participating in the conspiracy.

12. On June 30, 2021, deputies with the WCSO arrested MILLER on outstanding state arrest warrants from other jurisdictions. During a post-*Miranda* interview, MILLER stated he and Robert DAWSON were together in B.H.'s vehicle on the day of the robbery. MILLER stated that while driving around, DAWSON asked MILLER to drop him off at the BP gas station. MILLER later stated he and DAWSON discussed how easy it would be to rob Bare's, but MILLER indicated the conversation between him and DAWSON was meant in jest and that he did not actually intend to rob the store. MILLER further stated this conversation took place at Bare's in the afternoon on the day of the robbery, and DAWSON and Victim 1 were both present. MILLER also stated to investigators that Victim 1 is a "dear friend." MILLER mentioned DAWSON goes by the nickname "Rupe," which is tattooed on DAWSON's hand. During the interview, MILLER told law enforcement, "I swear, I think my buddy robbed her [the clerk at Bare's]." When asked what buddy he was referring to, MILLER responded "Robert DAWSON."

6

13. MILLER provided DAWSON's address as 7957 Dry Fork Road, North Tazewell, Virginia. MILLER stated he had picked up and dropped off DAWSON at this address in the past. MILLER reported that he had stayed the night at this address in the past, and that when he woke up in the morning Dawson was shooting a gun into the yard from the porch. MILLER also said that there were multiple dogs at the house, including two pit bulls.

14. Investigators reviewed records obtained from Google pursuant to a federal search warrant regarding an account attributed to MILLER. These Google records contained detailed location information collected from a mobile device connected to that account. Google records indicated the location of this device was recorded on several occasions at 7957 Dry Fork Road in North Tazewell, Virginia.

15. On June 30, 2021, investigators interviewed Victim 1 regarding the robbery. Victim 1 stated he/she observed a tall, muscular individual enter the store. After picking up a drink from the cooler, the individual approached the counter, demanded money from the register, and placed a small handgun on the counter. Victim 1 was unable to determine if it was a real firearm, but described it as small, black, and "old" looking. Victim 1 stated that he/she debated with the individual for several minutes and did not want to open the register for the suspect. Victim 1 stepped out from behind the counter, and the suspect attempted to open the cash register unsuccessfully. The suspect then took approximately $35 in cash from an

unlocked cashbox and two cartons of cigarettes, both of which were located behind the counter, before leaving the store.

16. Victim 1 also admitted to having a relationship with MILLER. Victim 1 stated that he/she was initially hesitant to disclose that fact as Victim 1 is presently married. Victim 1 confirmed that, on the afternoon of the robbery, he/she had been at Bare's with MILLER and another individual with long hair. Victim 1 further stated that he/she was with MILLER at B.H.'s residence the day after the robbery. Victim 1 also stated the individual with long hair who was with MILLER and Victim 1 at Bare's on the afternoon of the robbery was also present at B.H.'s residence, and that the individual had a puppy with him.

17. Based on MILLER's and Victim 1's statements, investigators concluded the second male present at B.H.'s residence on the day after the robbery was DAWSON. According to Victim 1, that evening Victim 1 overheard MILLER and DAWSON talking about the robbery. According to Victim 1, MILLER and DAWSON were upset about only getting $35 and two cartons of cigarettes. Victim 1 also stated that MILLER said he dropped DAWSON off and picked him up again after the robbery.

18. Victim 1 also admitted that, after the fact, MILLER told him/her that MILLER and his friend with the long hair had planned and executed the robbery.

8

19. On July 30, 2021, investigators interviewed Witness 1[3], who stated he/she stayed at the Red Roof Inn located at 887 Empire Dr. in Abingdon, Virginia for about 3 to 4 days around the time Bare's was robbed. Witness 1 stated that MILLER and another male who went by "Rupe" were in Witness 1's room at the Red Roof Inn on the day of the robbery. Witness 1 stated MILLER and Rupe arrived to his room in a "white van" belonging to an individual who lives in Damascus, VA. Based on Witness 1's description and facts gathered previously during the investigation, investigators concluded the owner of the "white van" is B.H. (referenced above). Witness 1 said that Rupe had a pit bull puppy with him. Witness 1 said that MILLER and Rupe came to his/her room in the late morning and asked to borrow money. Witness 1 explained that he/she and his/her significant other went out to dinner that night, that MILLER and Rupe were in the room when Witness 1 went out to dinner, that MILLER was in the room when Witness 1 came back from dinner, and that Rupe came back to the room sometime later. Witness 1 explained that when he/she returned from dinner, there was a large police presence at Bare's.

20. Witness 1 stated he/she has known MILLER for about a year. He/she described Rupe as being about 24 to 25 years old with sandy-colored shoulder-length

---

[3] At the time of this interview, Witness 1 was incarcerated related to pending state drug charges unrelated to this matter. Witness 1 consented to the interview in the presence of defense counsel, and received consideration for state charges in return for cooperation in this investigation.

9

hair and being very muscular. Rupe also told Witness 1 he was from Tazewell County. According to Witness 1, MILLER met Rupe somewhere in the area of Richlands, which is in Tazewell County, Virginia. Based on Witness 1's description of Rupe and statements made by MILLER, investigators concluded Rupe is indeed Robert DAWSON.

21. When asked about weapons, Witness 1 stated DAWSON showed him/her a small black pistol. Witness 1 also stated DAWSON wanted to sell that pistol for approximately $200. Witness 1 stated he/she saw DAWSON carry the pistol in his back pocket. Witness 1 also stated he/she saw DAWSON give the pistol to MILLER at one point, but did not see MILLER return it to DAWSON. When asked to elaborate on the weapon Witness 1 saw DAWSON carrying, Witness 1 stated he/she saw DAWSON show the pistol to another person who stopped by to visit. According to Witness 1, DAWSON removed the magazine from the pistol and Witness 1 saw that there were rounds present in the magazine.

22. According to Witness 1, at one point during the day DAWSON said he needed money to get back to Tazewell. DAWSON also stated he has committed robberies previously and was able to take a fair amount of cash. Witness 1 stated he/she heard MILLER and DAWSON talk about robbing Bare's believing they could get some money.

23. Witness 1 stated MILLER left a green jacket in the back of the vehicle driven by Witness 1's significant other. MILLER later instructed Witness 1 to "get rid of" the jacket. Witness 1 also reported seeing MILLER wearing a green jacket the day of the robbery.

24. According to Witness 1, MILLER told him that he visited Victim 1 at the store the day of and the day after the robbery. Witness 1 also stated MILLER said he and DAWSON both committed the robbery, and MILLER thought DAWSON set him up to "take the fall." Witness 1 also stated MILLER told him/her the proceeds from the robbery were a small amount of cash and some cigarettes.

25. Witness 1 also remarked that MILLER had told him that the photo of the robber posted to Facebook by law enforcement was actually MILLER, though investigators have dismissed this statement as the surveillance footage of the robber does not resemble MILLER's size or stature. According to criminal history reports that I have reviewed, DAWSON is a substantially larger person than MILLER. In addition, based on my review of a recorded interview with MILLER and the video surveillance of the robbery, the individual who entered and robbed Bare's has a voice that does not sound like MILLER's voice.

26. Investigators reviewed data provided by Google pursuant to a federal search warrant regarding an account attributed to MILLER. These Google records contained detailed location information collected from a mobile device connected to

that account. The location information placed the device in the immediate vicinity of the Red Roof Inn located in Abingdon Virginia earlier in the day prior to the robbery.

27. Based on my training and experience, I know that trace evidence, including but not limited to, fibers, soil, glass, human hair, and other materials are often exchanged between individuals during physical contact. Trace evidence can also be transferred from individuals to environments and surfaces, and from environments and surfaces to individuals. Likewise, biological evidence, such as blood, skin cells, and DNA can be transferred during physical contact. Both trace and biological evidence can indicate where an individual may have been, or with whom or what the individual has made physical contact. Based on my training and experience, I also know that both trace and biological evidence can be present for extended periods. I also know that both trace and biological evidence may not be visible to the naked eye and can remain on surfaces even when attempts have been made to remove them.

28. Based on my training and experience, I also know the following:

   a. DNA analysis may be conducted on bodily fluids or biological tissues recovered from items of evidence. The DNA testing results obtained from evidence samples are compared to DNA from reference samples

       collected from known individuals. Such analyses may be able to associate suspects with evidence items or with a crime scene.

b. Nuclear DNA is the most discriminating type of DNA and is typically analyzed in evidence containing body fluids, skin cells, bones, and hairs that have tissue at their root ends. This type of DNA testing has the ability to identify or exclude an individual as being the source of the DNA obtained from an evidence item.

c. Mitochondrial DNA (mtDNA) is a form of DNA that is transmitted from mother to child in a complete set; therefore, anyone in the maternal lineage will have the same mtDNA profile. This type of DNA testing can be used on evidence items such as naturally shed hairs, hair fragments, bones, and teeth. mtDNA analysis is highly sensitive and may allow scientists to obtain information from items of evidence containing little biological material. Because multiple individuals can have the same mtDNA profile, unique identifications are not possible from mtDNA analysis.

29. Based on my training and experience, I know that a laboratory analyst can compare a sample of DNA taken from DAWSON to any DNA material that may be recovered from the Burger King items described above.

13

## CONCLUSION

30. Based on my investigation, I submit that there is probable cause to believe that DAWSON participated in the robbery of Bare's on May 9, 2021. In addition, I submit that there is probable cause to believe that the collection of DNA from DAWSON may yield evidence that DAWSON participated in the robbery, in violation of 18 U.S.C. § 1951, and/or eliminate DAWSON's DNA from any profile identified from the items submitted for comparison.

31. Accordingly, I respectfully request that the Court issue a search warrant authorizing law enforcement to search DAWSON, as outlined in Attachment A, in order to collect a DNA sample from DAWSON by obtaining an oral buccal swab, as outlined in Attachment B.

## REQUEST FOR SEALING

32. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*[signature]*

Special Agent Peter Gonzalves
Bureau of Alcohol, Tobacco, Firearms
and Explosives
United States Department of Justice

Subscribed and sworn to before me on ~~telephonically~~ 11/29, 2021

*[signature]*

HONORABLE PAMELA MEADE SARGENT
UNITED STATES MAGISTRATE JUDGE


Reviewed by: Whit Pierce, AUSA

## ATTACHMENT A

### PERSON TO BE SEARCHED

Robert Russell DAWSON II, who is currently believed to reside at 7957 Dry Fork Road, North Tazewell, Virginia.

## ATTACHMENT B

### THINGS TO BE SEARCHED

A DNA sample from Robert Russell DAWSON II, in the form of buccal cells on an oral swab. The swab will be collected from the inside cheek portion of the mouth to sufficiently collect buccal cells.